## McGHEE v. UNITED STATES.
### No. 198.

Circuit Court of Appeals, Second Circuit.
March 5, 1946.

William Logan, Jr., and John F. X. McGohey, U. S. Atty., both of New York City (Hunt, Hill & Betts, and Geo. Whitefield Betts, Jr., and Helen F. Tuohy, all of New York City, of counsel), for respondent-appellant.

Jacquin Frank, and William L. Standard, both of New York City (Charles Glatzer, of New York City, of counsel), for libellant-respondent.

Before L. HAND, CHASE, and FRANK, Circuit Judges.

L. HAND, Circuit Judge.

The United States appeals from a decree in the admiralty, awarding damages to the libellant for an illness occasioned by exposure, resulting from the sinking of the respondent's "Liberty" ship, "Thomas Hooker," on March 6, 1943, on which the libellant was serving as a "wiper" in the engine room. The ship was lost in the Atlantic because of the cracking of her plates in a heavy sea, after she had nearly completed a westward voyage in convoy. The libellant asserts that the plates cracked because they had been weakened: (1.), by bombings while the ship was at the port of Bone, Algeria; (2.), by insufficient ballast when she put out on an earlier trip on February 11; and (3.), because she was not in proper ballast on the voyage on which she was lost. The respondent raises three objections: (1.), that the district court had no jurisdiction over the suit, which was brought under the Suits in Admiralty Act, 46 U.S.C.A. § 741 et seq.; (2.), that there was no proof of unseaworthiness, or of negligence in her operation or management; (3.), that the libellant's illness did not result from the ship's foundering. The facts were as follows.

The "Hooker" was launched in July, 1942 and delivered by the builders to the War Shipping Administration about August 12th of that year; she was one of the first of the "Liberty" ships: i.e., steel vessels with welded plates. She arrived in England on her maiden voyage on September 30th, and upon her captain's becoming ill, her chief mate, Hathaway, was given command (his first). She then went to Glasgow, where she suffered some unimportant damages to her superstructure on October 21st, which were easily repaired; and the American Bureau of Shipping issued a certificate of her seaworthiness. She lifted a cargo at Glasgow and left on October 25th, bound for Oran among the merchant vessels which aided in the African invasion. From Oran, where she suffered some minor damage, she returned in ballast to Glasgow on December 5th; and on December 24th she again left with a cargo, bound this time for Bone, Algeria, which she reached on January 5th. While there, she was subjected to repeated enemy attack, and two bombs struck near her: one on the dock about fifty feet away, and the other in the water about a hundred feet away. She returned to Glasgow in ballast, where she arrived on February 1st, and was obliged to lie for ten days at anchor five miles from the docks. So far as Hathaway knew, the vessel had suffered no damage at Bone; and, since he was forbidden even to report any enemy action unless the ship had suffered apparent damage, he did not ask for an inspection. She docked on February 11, for so long as was necessary to take ballast and was given 500 more tons—the amount fixed by the War Shipping Administration. This, together with the 800 tons which she already had, made 1300, which Hathaway thought enough for a voyage across the Atlantic. She then left to join a convoy, but, while off the north coast of Ireland, she met very heavy weather and her propeller raced and shook her so much as to disable her steering gear and force her to return to Glasgow for repairs. Several officials came on board

and examined the damage, and after repairs had been made, the American Bureau of Shipping a second time certified her as fit for service. Again, however, no inspection was made of her plates or any other part except the steering gear. Hathaway asked for more ballast and got 800 tons, making 2100 in all, with which she again broke ground on February 21st, her propeller "just submerged." She experienced severe weather in the Atlantic, the wind ranging between seven to nine on the Beaufort scale, accompanied by low temperatures; but by the afternoon of March 5th she had without incident reached a point about 400 miles from St. Johns, Newfoundland. Heavy seas were running, and she chanced to encounter an "unusual double wave," after rising to which, she "landed on the small wave coming along after." The strain was too much, and her plates cracked with a loud noise like an explosion. The cracks were not at the joints, but through the body of the plates; one ran from the port bulwark down the ship's side to the 'tweendeck; another ran thwartships from the same point in the port bulwark to the forward end of number three hatch, and from the after end of that hatch to the starboard bulwark. Another, aft of the last, ran thwartships from the store-room along the deck to the starboard bulwark, and a fourth ran from a point at the bulwark about fifteen feet aft of the end of the last mentioned crack, down the starboard side to the 'tweendeck. The cracks in the sides opened and closed with the ship's pitching and rolling, and took in water in quantity. Upon examination the master first decided to abandon ship that night and got ready the boats; but after signalling to a corvette which was in the escort, he determined to stay on board until morning, when, the weather having somewhat moderated, the crew put off in small boats and were taken on board the corvette which carried them to St. Johns, Newfoundland, whence they finally arrived in Boston by boat and train.

McGhee's testimony was that after the ship had cracked as we have described, he went to examine the store-room, which was partly flooded, and he stood for some time in water; that afterwards he was for two hours on deck, while it was being decided whether to abandon the ship; that he then went to the mess room, which was not heated, where he stayed until morning; and that finally he entered one of the open boats which took him to the corvette. During all this time he was thinly clad and for much of it constantly wet by cold water. He also said that he was exposed to cold in the barracks at St. Johns and on the trip from St. Johns to Boston. According to his testimony he had been passed as sound when he had signed on in December, 1942, although Hathaway did not so remember it; but he was confused as to his condition from the time he reached Boston until about the middle of May, when he had a hemorrhage. However, on May 17 he went to the Marine Hospital, at Hudson and Jay Streets, New York, where he was found to be suffering from "bilateral tuberculosis, moderately advanced."

Hathaway, upon his return to Boston, made a report to the supervising inspector in that place on March 20th, in which he declared that the ship foundered because of "insufficient ballast," and the inspector accepted this conclusion. Hathaway was a witness at the trial and, although the subsequent history of "Liberty" ships had made him somewhat doubtful, he still adhered to his original opinion that the plates cracked because the ballast was "insufficient," by which upon his cross examination he appeared to mean that too much had been put forward and aft, and not enough amidships. A ship is like a "girder," he said; she will be unduly strained if her midships is supported by water when the bow and stern were not. He did not, on the other hand, believe that the racing of the propeller, on the trip which began on February 11, had had any effect upon the plates. The respondent also called Nesbit, a lieutenant commander in the Coast Guard, whose duties were to inspect ships and who was the superior of some twenty inspectors, whose work he supervised. He differed from Hathaway on both points. He thought the ship was in proper trim when she left Glasgow on the 21st; but that the plates had been strained on the earlier trip of February 11, and that this had been a contributing factor to her loss. He also thought that the failure to inspect the ship both upon her return from Bone and from the first trip on February 11, was negligent.

The judge found that "the cracking apart of the said steamship was caused because the same was not seaworthy and by the negligence of the defendant in that no adequate inspection of the said hull and the

said ship had been made prior to the commencement of the journey from Glasgow to the United States, and because the said ship was not adequately and properly ballasted, and because such ballast as was placed therein was not properly located and distributed." It is not clear from this finding whether he was only thinking of the ballast of the "Hooker" on the voyage beginning February 21st, or also on the abortive trip on February 11th. In his opinion he said: "The cause of this crack-up may fairly be attributed to the failure to inspect, and either the want of sufficient ballast which made the ship so light that it was tossed around in the sea, racked by the frequent emergence of the propellers out of the water, or by the improper location and distribution of the ballast." Again, we are not sure whether he meant that the plates had been weakened by both faults; we should judge that he did. In any case it is clear that he counted the failure to inspect the ship as a fault, and we take it that this included, not only the failure to do so after she came back from her trip of February 11, but also the similar failure after the bombings.

We are all agreed that the District Court had jurisdiction under the suits in Admiralty Act, 46 U.S.C.A. § 741 et seq. Judge FRANK, and I think that it is not necessary to decide whether Eastern Transportation Co. v. United States, 272 U.S. 675, 47 S.Ct. 289, 71 L.Ed. 472, authoritatively held that the requirements of § 2 of the Act do not limit jurisdiction but only venue. In Carroll v. United States, 2 Cir., 133 F.2d 690, we held that the ship must be within the United States if the only liability was in rem (following Blamberg v. United States, 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346); and that was in accord with the principal purpose of the Act which was to protect ships of the United States from arrest. It is, however, consistent with that conclusion that suits in personam may be brought without regard to the presence of the ship within the United States, and that the requirement that they must be brought in the district where the libellant resides merely touches the venue. Indeed, Blamberg v. United States, supra, 260 U.S. 452, 43 S.Ct. 179, 67 L.Ed. 346, itself declared that the presence of the ship anywhere in the United States was enough, which by implication makes the provision that the suit must be brought where she is found, one of venue. However, even if these are not limitations on jurisdiction, the question would still remain whether in the case at bar the objection was not a good one, and was not abandoned. The libel alleged that the ship "at the time of filing the libel has been, is now and during the pendency of this suit will come within the jurisdiction of the United States of America and of this Honorable Court." This was flagrantly false, and the respondent denied it in its answer; but it also pleaded to the merits. McGhee is a Scot, which nowhere appeared in the pleadings, and even though the limitation only goes to the venue, and though the respondent abandoned the objection so far as it could have been based upon the absence of the ship, the question remains whether it also abandoned the objection, based upon McGhee's alienage. Judge CHASE believes, not only that the question is one of venue, but that the respondent abandoned all objections to venue by its failure to take them specifically.

Judge FRANK and I do not dissent, but pass the point without deciding it, as I have said, because we think that in any case the suit falls within § 1291(a) (2) of 50 U.S.C.A.Appendix. That act, passed on March 23, 1943, gave alien seamen on ships of the War Shipping Administration the rights of domestic seamen, and was expressly made retroactive to October 1, 1941. It is true that it does not end the difficulty, for the remedy which it provided was under the Suits in Admiralty Act, which, as we have just said, requires all suits to be brought at the libellant's residence, or where the ship may be found. Nevertheless, a literal reading of these conditions completely frustrates the purpose of § 1291; and this is equally true even though they concern only the venue, for it will always be possible to invoke them by a timely objection. Congress plainly meant to grant those alien seamen who manned our merchant marine during the war in the time of our dire necessity the same protection as American seamen. Surely nothing less could in decency have been vouchsafed them. Yet few of them could have "resided" in the United States; sailors are rovers at best, and alien sailors, if they have any "residence" at all, will seldom, if ever, have it here. Moreover, our merchant ships were under constant enemy attack, and in the spring of 1943 we were losing them in alarming numbers. Thus, if we read into § 1291 all

the conditions of the Suits in Admiralty Act, practically the remedy was open to aliens only in case the ship on which they were injured had survived and was in the United States, and then only in the district where they could catch her. We cannot believe that it was the intent of Congress by such juggling to keep the promise to the ear, only to break it to the hope. We think rather that by incorporating the Suits in Admiralty Act, § 1291 meant to give to alien seamen an available remedy by allowing them to sue in any district, at least when they had a claim in personam against the United States. That does no more violence to the letter of the statute than is frequently permissible when its obvious purpose will be otherwise defeated. Markham v. Cabel, 326 U.S. 404, 66 S.Ct. 193.

■ Next as to the merits. As has appeared the judge found as a contributing fault the respondent's failure to inspect the ship after her return from Bone and from her abortive attempt of February 11. To be relevant this finding presupposes two things: that it was careless not to inspect her, and that an inspection would have revealed that the plates had been weakened. In addition, we must further assume that the plates were in fact weakened, and some parts of Nesbit's testimony seems to imply as much, though that is not clear. At any rate, we shall assume, arguendo, that he meant to say so and that he was right. Nevertheless, if the plates were weakened on both occasions, the libellant did not prove, either that it was a lack of proper care not to inspect the ship, or that, if she had been inspected, the inspection would have disclosed the weakness of the plates. As to the lack of care we think that the conditions then existing made it reasonable to impose upon vessels the hazards involved, when no damage was apparent. The port of Glasgow was so crowded that the "Hooker" had to lie five miles away, and be docked for only a short time. Despatch was of the utmost urgency, and if despatch meant taking some chances, chances must be taken. The standard of care in any situation is determined by balancing the risk against the cost of precaution. In the end that always demands a choice between values, and the most vital national interests precluded precautions that might have been proper, if less had been at stake. But, even if this had not been true, and if inspection would have been possible without delays and disarrangements that would have unduly disturbed the prosecution of the war, the record is equivocal as to whether the accepted tests would have disclosed any weakening of the plates. Nobody pretends that any of them were actually cracked; Nesbit's was the only testimony as to the result of hammer tests and of inspection by divers; and he left it at best uncertain whether these would have disclosed anything but actual cracks. He first said that by a hammer test "an inspector can tell from the sound * * * whether a metal rivet is tight, and a plate or any kind of metal will have a different ring if there is a fracture in it." Again: "You would test inside with a hammer and you would look for leaks and cracks, or in addition * * * you could employ divers to go overboard." On his cross he was asked: "You as a competent man by tapping with a small hammer can tell by the sound as to its integrity" to which he answered: "As to its efficiency, yes." Again, "if a competent man with a hammer taps it you can still O.K. it by the sound. A. Very often." This bears out what would seem to a layman to be the inevitable fact: that such tests will only detect "fractures" in plates. At least, if a plate, which has been merely weakened, responds to tapping differently from an unweakened plate, the libellant did not prove it. We therefore count out the failures to inspect as actionable faults.

The next fault was the failure to take on enough ballast upon the trip of February 11. This, we agree, the judge might have found to be negligent, not only because Hathaway appears to have accepted the added 500 tons as enough, but because the decision lay with the War Shipping Administration anyway. The conclusion that the racing of the propeller and the consequent vibration had any effect upon the plates, again rests upon Nesbit's testimony. When he was first asked whether the insufficient ballast "had any connection with this cracking up" he answered: "That would be a contributing factor"; and a mere possibility is not a foundation for liability. Later, under questioning which was somewhat confusing, he did say more positively: "it was a contributing factor in my opinion." Obviously, this testimony, taken as a whole, is not very satisfactory, and Hathaway contradicted it; yet, when all is said, it was the opinion

of a qualified witness, and the record does not preserve many of those factors which may have made that opinion persuasive. The judge has a much larger measure of responsibility than we upon such issues, and if it clearly appeared that he thought that Nesbit's opinion was a sufficient basis for finding that if the ship had had enough ballast on the trip of February 11, she would not have cracked on March 5th, however sceptical we might be, we should scarcely reverse it as "clearly erroneous."

The last of the faults found is that the ballast on the second trip, though enough in amount, was ill distributed. Here Nesbit and Hathaway changed sides. Moreover, in his original report Hathaway had said nothing about the distribution of the ballast; he attributed the ship's loss to its insufficiency: quite another question, and without basis in fact. Upon his direct too he said nothing about its distribution; and for that matter he had come to be doubtful about his original conclusion that ballast had had anything to do with the catastrophe. He "could easily be wrong because so many of them"—"Liberty" ships —"have broken since that time." It was upon his cross examination that for the first time he suggested, not that the ballast was too little, but that it was improperly distributed. Even more than in the case of Nesbit, does this apparent afterthought seem a tenuous support for a finding; yet again, in spite of his youth and inexperience, we should hesitate to substitute ourselves as judges of his reliability. It was possible for the judge to find that his opinion was reliable on this issue; he may have been convincing to a degree which the print cannot convey.

■ These findings, read with the opinion, leave us in doubt, as we have already intimated, whether the judge meant that the weakening of the plates, resulting from each one of the faults found, would alone have caused the ship to crack as she did, or whether the combination of all three was necessary to that result. Since we have eliminated one of these—the failures to inspect—the case must in any event be remanded for further findings whether either the insufficient ballast on the first trip, or the ill distribution of the ballast on the second trip, was the cause. We could not accept a finding that both in conjunction were the cause, because that would presuppose that Nesbit and Hathaway were right in what they affirmed, but wrong in

what they denied. Since each denied what the other affirmed, it would seem inevitable that one or the other was reliable as an expert, but not both. Besides, as has already appeared, the testimony of each is baffling and unsatisfactory and it seems to us that justice will be best secured by having them re-examined on the two critical issues which are these.

(1.) Were the ship's plates strained on the trip of February 11 because she had insufficient ballast, and were those strains a necessary factor in her cracking on March 5th?

(2.) Was the ballast improperly stowed on the trip of February 21, and was that improper stowage a necessary factor to her cracking on March 5th?

The only other issue is whether McGhee's exposure, resulting from the ship's foundering, was the cause of his tuberculosis. That finding does not appear to have been "clearly erroneous," and we affirm it. The judge did not expressly find whether McGhee had improperly neglected his safety; but we assume that he included this in the award which he made. We affirm the amount of that award and with it the implied finding.

Decree reversed; cause remanded for further proceedings in accordance with the foregoing.