**COMMISSIONER OF INTERNAL REVE- NUE v. UNION PAC. R. CO.**

Nos. 221–227, Dockets 21907–21913.

United States Court of Appeals, Second Circuit.

Argued April 3, 1951.

Decided May 7, 1951.

Charles Oliphant, Washington, D. C., Theron L. Caudle, Asst. Atty. Gen., Hilbert P. Zarky, Washington, D. C., Ellis N. Slack, Lee A. Jackson, Sp. Assts. to Atty. Gen., for petitioner.

Joseph F. Mann, Frank E. Barnett and Arthur Z. Gray, New York City, for respondent.

Before L. HAND, Chief Judge, AUGUSTUS N. HAND, and CLARK, Circuit Judges.

L. HAND, Chief Judge.

This appeal concerns the deductions from income taxes taken by the Union Pacific Railroad during four years; there are six other appeals affecting that road and four affiliated roads, but, since all turn on the same questions, we shall discuss this one alone. Those questions are (1) whether the road, to which the Interstate Commerce Commission had until 1942 given leave to keep its books on a "Retirement Accounting" system, in computing deductions for depreciation, was obliged to conform to § 113(b)(1)(C) of the Internal Revenue Code;[1] and (2) whether the Tax Court was right in assuming that the Commissioner had stipulated that he would accept the road's capital account in its books, on which it based its deductions. Section 23(f) allows a corporate taxpayer to deduct "losses sustained" during the year, and § 23(i) provides that the "basis for determining the amount of deduction for losses sustained * * * shall be the adjusted basis provided in section 113(b) for determining the loss from the sale or other disposition of property." Section 23(l) allows, as a deduction "Depreciation. A reasonable allowance for * * * exhaustion, wear and tear (including a reasonable allowance for obsolescence)". Section 114(a) provides that the "basis" for depreciation shall be the "adjusted basis" under § 113(b); and we understand that both sides agree that that section makes § 113(b) applicable to the deductions here at issue.

Theoretically, the ideal way to compute the depreciation of a road's "ways and structures" would be to appraise the value of each item at the beginning and at the end of its fiscal year, and to subtract the difference. That would be a practical impossibility, and no one suggests its propriety. Another way would be to estimate

---

1. § 113(b) (1) (C), Title 26, U.S.Code.

the life of each item and assume that in every year its depreciation was the same—"Straight Line Depreciation." While this might not be accurate for any single item, differences would be cancelled out, when there were a great many. It would also be possible to group together a number of similar items, to assume that each had the same longevity, and to make a collective proportional deduction for all. "Retirement Accounting" was an alternative: it made no deduction for the depreciation of any item, or group of items, until it, or they, were abandoned; and then it credited to depreciation the original cost, plus additions chargeable to capital, deducting any salvage. Thus, in any year the road got no credit for actual depreciation during that year upon any but abandoned items; but in its stead it got a cumulative credit made up of all past depreciations of abandoned items. The assumption was that the aggregate of actual annual depreciations upon items not abandoned, which the road did not deduct, would, if the system lasted long enough, match the aggregate of the original costs and capital increments of all abandoned items. If the number of items was great enough, the result in the case of a stable system was probably about the same under this method as under "Straight Line Depreciation."

The Commissioner's argument is that any deduction taken for an abandoned item in "Retirement Accounting" must be limited to its cost, properly reduced for depreciation before 1913. The road answers that this would falsify the theory upon which that system of accounting proceeded. For example, if a bridge having a life of fifty years were abandoned in 1914, upon the Commissioner's theory the road would be allowed a deduction of only two per cent of its cost, and would not be allowed any deduction for the indubitable depreciation in that year of any other items. It may be answered that, even so, that would not finally forfeit the road's right to the actual depreciation in that year of an item not then abandoned; but that it would only suspend the deduction until the item was itself abandoned, when the aggregate of all its past annual depreciations would be al-lowed at once. There are, however, two answers to such an argument. It is true that, if "Retirement Accounting" had gone on indefinitely, in the end the road would have got credit for all the suspended annual increments of depreciation of an item, when that item was in its turn abandoned. Suppose, however, that "Retirement Accounting" was discontinued in a given year, as in fact happened in the year 1942. In that year there were many items which had not been abandoned, and although each of these had depreciated in all the preceding years, the road would be finally deprived of all this aggregate depreciation, for it would start in the year 1943 with "Straight Line Depreciation." True, it would have been fair to forfeit any deductions for these depreciations, accumulated before 1942, if the system had started in 1913 with an allowance of the whole cost of the items abandoned in that year, because the depreciations before 1913 so deducted would have been the equivalent of those which would be lost by the abolition of "Retirement Accounting"; but only in case the depreciations before 1913 should have been allowed. Besides, there would have been another objection. Even though the "Retirement Accounting" had been allowed to go on indefinitely and though all deductions upon items not abandoned had, though suspended, been eventually allowed, they would not have been allowed in the year in which they had occurred. That is contrary to the underlying basis of all income taxation. It is plain from the foregoing that the Commissioner's position is neither "Straight Line Depreciation," nor "Retirement Accounting"; but an unjust and illogical hybrid.

The Commissioner's position must therefore depend upon whether § 113(b)(1)(C) inexorably required a road, which had adopted "Retirement Accounting" with the leave of the Interstate Commerce Commission, so to mutilate it—for that is not too strong a word—in application. During the years in question the Regulations [2] provided as the "Method of computing depreciation allowance" that "The capital sum to be recovered shall be charged off over the useful life of the property, either in

2. Article 23(*l*) (5), Regulations 86, 94.

equal installments"—"Straight Line Depreciation"—"or in accordance with any other recognized trade practice." The Bureau of Internal Revenue during the same years implemented this regulation by means of "Bulletin F," which read as follows: "in general the rates of depreciation on physical property of common carriers * * * will be governed by the action taken by the commission in its application of the provisions of section 20, paragraph 5, of the Interstate Commerce Act." [3] This referred to the section which gives power to the Commission to prescribe the forms in which railways may keep their accounts. If the "Bulletin" had stopped with these words, we cannot understand how anyone could doubt that the Treasury accepted "Retirement Accounting" with all its incidents as "proper adjustment" within the meaning of § 113(b)(1). In its original form "Bulletin F" concluded as follows: "However, the basis of depreciable property must conform to the limitations of costs or other allowable value as prescribed by the Revenue Act of 1928"; and it was this sentence which the amendment to the "Bulletin" in 1942 changed to read: "When property acquired prior to March 1, 1913, is retired, the cost should be reduced to the extent of the depreciation sustained to March 1, 1913." In its original form the sentence did no more than make explicit what would have been implied in any event: that is, that the Interstate Commerce Commission's formula for computing "rates of depreciation" must not violate the tax statute; and that left it entirely open whether "Retirement Accounting," if consistently carried out, would do so. The amendment of 1942, being made for the first time after "Retirement Accounting" had ended, and after there was no longer any reason to interpret the regulation for the guidance of railroads has not the weight it would have had, if it had been promulgated for that purpose. The question of course remains whether the regulation, as originally interpreted, did violate § 113(b)(1)(C). If it did, "Retirement Accounting" was never practicable for tax purposes, because, as we have shown, it would have been absurd to continue it after 1913, if it was to be subject to § 113(b)(1)(C).

"Retirement Accounting" was the generally approved system of railroads long before they had any motive to reduce taxes. It dealt with a problem whose answer inevitably involved some kind of conventional treatment, for "Straight Line Depreciation"—the alternative—does not itself conform literally to the truth, since it presupposes without any warrant in fact that all the items of "ways and structures" depreciate equally every year. Probably it is impossible to prove that, even over a large number of years, the deduction of the full cost of retired items is as close an equivalent of the aggregate actual depreciation of all the items, as "Straight Line Depreciation"; but it is also impossible to prove that it is not. Convention for convention, there is, at least on this record, no *a priori* reason to say that one hits nearer the mark than the other. We must always keep in mind that the allowance for the full cost of an item abandoned, say in 1914, was not a deduction for past depreciation; for, although in form it may appear to have been such, it was allowed only as a measure of those actual depreciations in that year which would otherwise never have been allowed. The purpose of § 113(b)(1)(C) was only to make sure that in computing "gain or loss" upon a piece of property, one should begin with its value when the Sixteenth Amendment took effect. It would be a complete perversion of its purpose to read it as forbidding a reasonable and authorized method of appraising depreciations after March 1, 1913. Such literalism the Supreme Court has again and again disapproved; [4] as have we. [5]

3. § 20(5), Title 49, U.S.C.A.

4. The Abby Dodge, 223 U.S. 166, 32 S.Ct. 310, 56 L.Ed. 390; United States v. Walter, 263 U.S. 15, 44 S.Ct. 10, 68 L.Ed. 137; Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596; United States v. American Trucking Associations, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345;

United States v. Hutcheson, 312 U.S. 219, 235, 61 S.Ct. 463, 85 L.Ed. 788; United States v. N. E. Rosenblum Truck Lines, 315 U.S. 50, 55, 62 S.Ct. 445, 86 L.Ed. 671; Markham v. Cabell, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165.

5. McGhee v. United States, D.C., 154 F.2d 101, 105; Walling v. Connecticut Co., 1

The second question is whether the Tax Court was justified in deciding the case upon the pleadings and the concessions of counsel. The road in its petition had alleged that the deductions it had claimed in its returns were made "at the cost of such property"—the retired items—"as shown by the property account in which it was carried, less any salvage realized"; and that allegation the Commissioner denied in his answer. At the hearing the parties were chiefly concerned with whether the case, as it stood, was within an earlier ruling of the Tax Court in Los Angeles & Salt Lake R. Co. v. Commissioner of Internal Revenue.[6] The Tax Court had there ruled that, unless the road had claimed, in addition to the original cost of the property, "expenditures" under § 113(b)(1)(A), it was not subject to § 113(b)(1)(C); and § 113(b)(1)(A) did not apply in that case because the road had not claimed more than cost. In the case at bar the road was therefore anxious to prove that it did not rely upon § 113(b)(1)(A), and the Commissioner was anxious to prove the opposite. As we have shown, it is immaterial, when the road was keeping its books on "Retirement Accounting," whether anything was, or was not, added to cost under § 113(b) (1)(A); because § 113(b)(1)(C) does apply as little when "expenditures" have been added as when they have not. However, a desire to come within the earlier ruling explains much of the colloquy of counsel which, taken as a whole, does not justify the conclusion that the Commissioner meant to withdraw the denial in his answer, and to concede that the road had deducted only the "cost of such property as shown by the property account." Moreover, even though we take it that the deductions did match with that account, the question remains whether the account stated the "adjusted basis," as § 113(b) prescribes it. Unless the road is content to rest upon the original cost and proves that that is all that it deducted, it must prove that the additions "shown by the property account" were properly "chargeable to capital" within the meaning of § 113(b)(1)(A). We do not say that it will not be enough to show that any "expenditures" so added to the original cost were required by the rules of the Interstate Commerce Commission. That is quite another question than whether "Retirement Accounting," which was permitted by those rules, violated § 113(b)(1)(C); and it is a question which cannot be answered on this record, and whose answer especially in so large a tax demands another hearing.

Order reversed; cause remanded.

CLARK, Circuit Judge (dissenting in part).

I agree with the remand of the case for trial, but I disagree with the disposition made of the major issue which makes remand of little importance. For my part I should prefer to postpone decision until we have a complete record of the actual facts, rather than merely the various asseverations of the parties. Quite possibly ultimate decision would not be changed, the issue being one of statutory meaning; but fuller knowledge does justify a greater confidence in adjudication, whatever the outcome. Thus the opinion rests largely, if not wholly, on the unfairness to the railroad if it "was obliged to conform to § 113(b)(1) (C) of the Internal Revenue Code." In argument the contention appeared to rest upon the assertion that the railroad's records would not reflect proper additions to the pre-1913 capital account and hence taking depreciation to March 1, 1913, would be in effect a one-way approach, always subtracting but never adding to this account. The Commissioner contests this and a trial might well show the railroad's books to be better than it thinks and sufficient at least to set up tolerably clear accounts for the purpose in hand. But if we must now make decision, I cannot avoid a conclusion that an express statutory mandate—applying equally to all taxpayers, with no exceptions for railroads—has been disobeyed.

It should be made clear just what the statute does, and for what purpose; for

Cir., 154 F.2d 552; Elizabeth Arden, Inc., v. Federal Trade Commission, 2 Cir., 156 F.2d 132, 134.

6. 4 T.C. 634.

954

with deference I must suggest that many extraneous issues seem to have come in, and that views of depreciation accounting, whether hybrid, mutilated, or otherwise reprehensible, but dealing with ordinary yearly income tax computations from 1913 on, have (so far as I can discover) little pertinence to the narrow issue before us. The question is what is the statutory, i.e., arbitrary, basis to be ascribed to property held on March 1, 1913, primarily for the purpose of ascertaining gain or loss on ultimate disposition of the property and secondarily for such other purposes, including the computing of yearly deductions for depreciation, as the statute may additionally specify. So I.R.C. § 113, 26 U.S.C.A. § 113, after providing in (a) for the unadjusted basis as usually the cost of the property, but in the case of property acquired before March 1, 1913, the "fair market value" if less than cost (subparag. 14), goes on in (b) to formulate the "adjusted basis." The pertinent provision is as follows: "(1) General rule. Proper adjustment in respect of the property shall in all cases be made—

"* * * (C) in respect of any period prior to March 1, 1913, for exhaustion, wear and tear, obsolescence, amortization, and depletion, *to the extent sustained."* (Emphasis supplied.)

This is now so old a rule, United States v. Ludey, 274 U.S. 295, 297, 298, 47 S.Ct. 608, 71 L.Ed. 1054, that, if for no other ground than ancient use in income tax law, one would, it seems, hesitate to upset it for all corporations or even individuals. Further, given the definite change from unconstitutionality to constitutionality of the income tax, some method, more or less arbitrary in any event, had to be devised in 1913 to settle these problems. Certainly I cannot now think of a better, or even a fairer, one. But if we now read some exceptions into the statute they surely must apply to all taxpayers equally in like situation. What are the facts that might give special position to railroads—other than the mere passage of time which may prevent other taxpayers from now raising question? A full trial might illuminate these matters further, but at present I have

difficulty in seeing what they are. The I. C. C. rules of accounting until 1942 do not seem to me to answer this narrow question, nor do the Commissioner's rulings or regulations dealing with the separate matter of adjusting yearly income tax payments after the initial take-off. Further, of course, the Commissioner cannot estop the United States or set aside clear statutory commands.

Retirement accounting could be employed—or claimed—by a business corporation or individual. Suppose the "small-business" man, about which we now hear so much, was to claim, in reduction of a substantial capital gain, that his 1913 value was substantially the original cost of the property whenever acquired because of his practice in always replacing his machinery and plant whenever there was need. Could he not rely upon this decision as his authority? Perhaps time has sealed the mouths of all except the group of taxpayers now before us; but how can we be sure we are not now opening a veritable Pandora's box?

There seems little gain in discussion by me here of the respondent's further claim of res judicata because of the earlier Los Angeles case, though I should think the contention not valid and am hence brought to the discussion of the Revenue Code provision above.