**OZANIC et al. v. UNITED STATES.**

No. 201, Docket 21931.

United States Court of Appeals
Second Circuit.

Argued March 12, 1951.

Decided April 10, 1951.

Leonard J. Matteson and Bigham, Englar, Jones & Houston, all of New York City (Julian S. Gravely, Jr., New York City, of counsel), for appellants.

Edward L. Smith and Irving H. Saypol, U. S. Atty., New York City, for appellee.

Before L. HAND Chief Judge, and SWAN and CHASE, Circuit Judges.

L. HAND, Chief Judge.

■ The libellant, Ozanic appeals from a decree in the admiralty, marking "discharged and satisfied" an earlier decree in the same suit which made an award of $100,447.83 in his favor against the United States; Shipping Assets Clearing, Ltd., appeals from an order denying it leave to intervene in the same suit. Ozanic, who had been master of the ship "Petar," originally brought the suit under the Public Vessels Act[1] to recover for her loss on March 8, 1942, in a collision with a tanker owned by the United States, in which both ships were at fault. At the time of the collision, and when the suit was commenced, a Yugoslav corporation owned the "Petar"; but in December, 1946, the "Praesidium" and National Assembly of Yugoslavia "nationalized" the corporation by proceedings which professed to make the claim "state property"; and it is common ground that it became so.[2] On July 31, 1947, an agreement was executed between the British Government, the Yugoslav Government, the "nationalized" successor of the original corporate owner of the "Petar," one Bateson and Shipping Assets Clearing, Ltd., which settled the claims of the British Government against the Yugoslav Government, touching shipping transactions, including claims arising out of the disposal by the Yugoslav Government of "the assets of the Yugoslav owners held or situate outside Yugoslavia." In consideration of the release by the parties of their claims against it, the Yugoslav Government agreed to assign to Shipping Assets Clearing, Ltd., a number of maritime claims which it held against third persons, among which was the claim in suit; and on August 26, 1947, in implementation of this agreement the Yugoslav Government by a separate instrument assigned the claim to Shipping Assets Clearing, Ltd. On July 19, 1948, the Secretary of State of the United States and the "Deputy Minister of Finance" of Yugoslavia, entered into a general agreement settling the claims of the United States for "Lend-Lease" benefits granted Yugo-

1. § 781 et seq., Title 46 U.S.C.A.

2. United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134.

slavia during the late war. Among other claims against the United States, which the Yugoslav Government agreed to release as part of the consideration for its release by the United States, were five classes of claims of which the fifth was described as follows: "Claims arising out of maritime collisions * * * occurring on and after April 6, 1941, and prior to July 1, 1946." In reliance upon its assignment in 1947, which therefore antedated this release, Shipping Assets Clearing, Ltd., filed a petition in this suit on November 30, 1948, for leave to intervene. This petition Judge Rifkind denied in an opinion filed on March 10, 1949, D.C., 83 F.Supp. 4, and on July 15, 1949, Judge Ryan ordered that the final decree in Ozanic's favor should be marked "satisfied" and that the petition for intervention be denied. This is the order from which Ozanic and Shipping Assets Clearing, Ltd., have appealed. The appellants' argument is (1) that the Anti-Assignment Act[3] did not invalidate the assignment of August 26, 1947; (2) that in any event the United States was already charged with notice of it, before the agreement of July 19, 1948; (3) that moreover that agreement did not cover the claim in suit. The United States answers (1) that the assignment, not being involuntary, was within the Anti-Assignment Act; (2) that it was not charged with notice of the assignment; and (3) that, since the claim was not negotiable, Shipping Assets Clearing, Ltd., as assignee, took subject to any set-offs or counterclaims, including the claims covered by the agreement of July 19, 1948.

■ The argument that the assignment to Shipping Assets Clearing, Ltd., was "involuntary" and was therefore not within the Anti-Assignment Act does not appear to us to have basis in the record. Had the assignee represented the expropriated shareholders of the corporate owner of the "Petar," conceivably it might be possible to regard the assignment as restitution for the original expropriation, as therefore "involuntary," and within the

implied exceptions to the Anti-Assignment Act. Although the appellants in their brief assert that the assignment of the claim to Shipping Assets Clearing, Ltd., was to it "as representative of the Foreign Interests including the shareholders of the original corporate owner of the 'Petar'," we can find nothing to indicate that it was for the benefit of those shareholders. It is true that among the "Managers" whom Bateson represented (and whom we assume Shipping Assets Clearing, Ltd., also came to represent) appear a British corporation and a New York corporation who had represented the original Yugoslav corporation that owned the "Petar"; but that is no indication that the shareholders of that corporation were to be beneficiaries of the agreement. On the other hand when we look at the "Foreign Interests" which Bateson also represented, the appropriate schedule contains no names of shareholders of the original corporation, or any mention whatever of that corporation. There is not a syllable which we can find to suggest that the expropriated shareholders were beneficiaries, or that the assignment of the claim in suit was intended as restitution to them. The general purpose of the agreement apparently was to make a settlement with a number of claimants, including expropriated shareholders "now outside Yugoslavia," but only those. The argument that a purpose of restitution, if it did exist at all, would make the assignment "involuntary" is doubtful at best; but for it to have any weight it would have to appear that the claim was allocated to the shareholders of the "Petar," and to them alone. Certainly there was nothing of that sort in the agreement.

■ The other argument to meet the Anti-Assignment Act has more substance; it is that under the Suits in Admiralty Act[4] (whose procedure was carried over into the Public Vessels Act), suits proceed "according to the principles of law and to the rules of practice obtaining in like cases between private parties"; and that the Act repealed all inconsistent acts.[5]

3. § 203, Title 31 U.S.C.A.
4. §§ 741–52, Tit. 46 U.S.C.A.

5. § 13 of the Act of March 9, 1920, 41 St. L. 528.

In the admiralty the assignee of a chose of action is recognized as the obligee and may sue in his own name,[6] and it has twice been held that the Suits in Admiralty Act—particularly the repealing section—made inapplicable the Anti-Assignment Act.[7] We do not, however, find it necessary to decide as to this reasoning and arguendo we shall assume that it is sound, because even so we think that Shipping Assets Clearing, Ltd., cannot prevail.

■■■ It is true, as the United States argues, that the assignee of a non-negotiable chose in action takes subject to all existing set-offs and counterclaims;[8] and in the case at bar all the claims of the United States against the Yugoslav Government which constituted the consideration for that government's release of the United States, were in existence when the agreement of 1947 was made. It might therefore appear at first blush that this was an answer to the claim in suit. However, it is not, because, if the Yugoslav Government had sued in the district court under the Public Vessels Act the privilege of the United States to interpose any set-off or counterclaim would have been limited to such as arose "out of the same contract or cause of action for which the original libel was filed";[9] and there were none. Therefore, this ground of avoiding the assignment would not be good; but we think that there is another one which is. Although the agreement of 1948 was not a treaty, and did not in terms profess to repeal the consent of the United States to be sued which the Public Vessels Act had granted, we regard it as overriding that consent, and asserting the immunity of the United States from suit upon any claims whose release was part of the consideration of the United States for the release of its "Lend-Lease" claims against the Yugoslav Government. The constitutional power of the President extends to the settlement of mutual claims between a foreign government and the United States, at least when it is an incident to the recognition of that government;[10] and it would be unreasonable to circumscribe it to such controversies. The continued mutual amity between the nation and other powers again and again depends upon a satisfactory compromise of mutual claims; the necessary power to make such compromises has existed from the earliest times and been exercised by the foreign offices of all civilized nations. The case at bar would be a particularly inept occasion to import into it an exception. In the first place the exception could stand only upon an ancient detail of admiralty procedure, generally now superseded. Again, it can arise only in those relatively rare instances in which the Anti-Assignment Act does not invalidate an assignment of the claim. Finally, it contravenes the general policy of the Set-Off Act[11] that claims against the United States are always to be subject to set-off. These considerations alone would go far to persuade us that, even though the Agreement of 1948 stood only upon the constitutional power of the President to come to an accommodation with a foreign government upon mutual claims between the two nations, it would suffice to withdraw the consent to be sued:

■■■ However, there is more. The agreement in question here was "a settlement for lend-lease," made under the "Lend-Lease Act" of March 11, 1941,[12]

6. The Mandu, 2 Cir., 102 F.2d 459.

7. The West Grama, 1924 Am.Mar.Cas. 1444; Seaboard Fruit Co. v. United States, D.C., 73 F.Supp. 730.

8. Wagner v. Central Banking & Security Co., 4 Cir., 249 F. 145; Andresen v. Thompson, D.C., 56 F.2d 642; Williston on Contracts, § 432; Restatement of Contracts, § 167(1).

9. Admiralty Rule 50, 28 U.S.C.A.; United Transportation & Lighterage Co. v. N. Y. & Baltimore Transportation Line, 2 Cir., 185 F. 386; Castner, Curran & Bullitt v. U. S., 2 Cir., 5 F.2d 214.

10. United States v. Belmont, supra, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134; United States v. Pink, 315 U.S. 203, 229, 230, 240, 241, 62 S.Ct. 552, 86 L.Ed. 796.

11. § 227, Title 31 U.S.C.A.

12. §§ 411–419, Title 22 U.S.C.A.

§ 412(b) of which provided that "the terms and conditions upon which any such, foreign government receives any aid * * * shall be those which the President deems satisfactory, and the benefit to the United States may be payment or repayment in kind or property, or any other direct or indirect benefit which the President deems satisfactory." On October 28, 1941, by subdivision 2 of Executive Order 8926,[13] the President authorized the administrator of "Lend-Lease" to exercise all the President's powers under the act, except that "the master agreement with each nation * * * setting forth the general terms and conditions under which such nation is to receive such aid, shall be negotiated by the State Department, with the advice of the Economic Defense Board and the Office of Lend-Lease Administration." The "master agreement" with Yugoslavia, which was "negotiated" by the Secretary of State, recited that it was "expedient that the final determination of the terms and conditions upon which the Royal Yugoslav Government receives such aid and of the benefits to be received by the United States of America in return therefor, should be deferred until the extent of the defense aid is known and until the progress of events makes clearer the final terms and conditions and benefits which will be in the mutual interest."[14] Article VI provided that "in the final determination of the benefits to be provided to the United States of America * * * full cognizance shall be taken of all property, services, information, facilities or other benefits or considerations provided by the Royal Yugoslav Government." These passages show that the considerations moving to the United States in exchange for "Lend-Lease" benefits were purposely left undetermined at the time. That was indeed inevitable, but it resulted that "the terms and conditions" of the "master agreement" were finally fixed only by the agreement of July 19, 1948, and that that agreement was within the Secretary's authority. He then chose to accept a release of the claim against the United States for the loss of the "Petar" as one of the "terms and conditions" of the original "Lend-Lease" contract, and he did so by authority delegated to him by the President under the Act of March 11, 1941. The validity of the assignment of a contract as against the obligor depends upon the law of the place of performance,[15] and it is therefore the law of the United States to which we must look to decide whether the assignee, Shipping Assets Clearing, Ltd., may recover. Since under that law the release was valid, the decree was right.

We have not discussed the appellants' final argument that the release by its terms did not include the claim in suit, because it is too apparent that it did. Besides, if there was any doubt as to that as mere matter of interpretation, the "Petar" claim had been one of those about which the parties were in negotiation before the agreement was executed, and the language chosen for the release necessarily covered it.

Decree affirmed.

13. Page 1018, Book 1, Cumulative Supplement of 1943, Code Federal Regulations.

14. Department of State, Executive Agreement Series 263.

15. Restatement of Conflict of Laws, §§ 353, 358(c).