**SAINT JOHN MARINE CO.,**
Plaintiff–Appellee,

v.

**UNITED STATES of America,**
Defendant–Appellant.

No. 1317, Docket 95–6247.

United States Court of Appeals,
Second Circuit.

Argued April 4, 1996.

Decided Aug. 5, 1996.

Jack S. Rockafellow, United States Department of Justice, New York City (Frank W. Hunger, Assistant Attorney General, Mary Jo White, United States Attorney, Janis G. Schulmeisters, Attorney in Charge, Torts Branch, Civil Division, United States Department of Justice, New York City, of counsel), for Defendant–Appellant.

John C. Koster, New York City (Catherine N. Niarchos, Healy & Baillie, New York City, of counsel), for Plaintiff–Appellee.

Before WINTER, JACOBS, and CABRANES, Circuit Judges.

JACOBS, Circuit Judge:

Plaintiff Saint John Marine Co., owner of the vessel M/V Saint John, entered into a time charter party with Afram Lines (International) Inc., which in turn entered into a subvoyage charter party with the Agency for International Development, an agency of the United States Government. The time charter party included a common provision that secures the charter hire by giving the shipowner a lien on the subfreights owed to Afram. It is stipulated that the shipowner gave notice to the Government that Afram had failed to pay an amount due on the charter hire and that the shipowner had a contractual lien on subfreights that the Government had not yet paid over to Afram. The Government has not disputed that a private party in its shoes would be liable to Saint John Marine. The question presented

is whether, in these circumstances, the shipowner can enforce its contractual lien against the Government. The Government argues that the lien operates as an assignment of a claim against the Government and is therefore rendered unenforceable by the Assignment of Claims Act, 31 U.S.C. § 3727 (the "Anti–Assignment Act"). Saint John Marine argues that the Anti–Assignment Act does not affect claims asserted (as this claim is asserted) under the Suits in Admiralty Act ("SIAA"), 46 U.S.C.App. §§ 741–752.

The Government appeals from a final judgment entered by the United States District Court for the Southern District of New York (Kram, *J.*) in favor of Saint John Marine. Although we agree with the Government that the Anti–Assignment Act applies to claims asserted under the SIAA, we affirm the judgment on the ground that the Anti–Assignment Act does not affect assignments effected by operation of law.

## BACKGROUND

A. *Facts.*

This case was submitted for trial on a set of stipulated facts. With certain interpolations, the facts set forth here are drawn virtually word for word from that stipulation.

■ Saint John Marine, a private Greek corporation, is the owner of the M/V Saint John, a general cargo vessel. Saint John Marine time chartered the vessel to Afram Lines (International) Inc. ("Afram"), a private corporation, on September 21, 1990. The terms of the time charter at clause 18 included a provision for Saint John Marine's lien on subfreights as follows: [1]

> That *the Owners shall have a lien upon* all cargos, and *all subfreights and subhires for any amounts due under the charter,* including general average contributions and the Charterers to have a lien on the ship for all monies paid in advance and not

earned, and any overpaid hire or excess deposit to be returned at once.

(Emphasis added.)

Also on September 21, 1990, the vessel was subvoyage chartered by Afram to the Agency for International Development ("AID"), which is an agency of the United States Government. While on time charter to Afram and on subvoyage charter to AID, the vessel loaded cargo at Lake Charles and New Orleans, Louisiana and at Houston, Texas for discharge at Larnica, Cyprus and at Amman, Jordan. The Saint John carried a bulk cargo of rice, flour and vegetable oil owned by the United States Government.

On November 28, 1990, AID arranged to pay subfreights due under the subvoyage charter party by authorizing the United States Treasury to pay Afram via Den norske Bank the amount of $1,860,324.09. Within the following two days, the Treasury transferred the subfreights to Den norske Bank for credit to Afram.

While the vessel was on time charter to Afram and on subvoyage charter to AID, Afram failed to pay Saint John Marine amounts due under the Saint John/Afram time charter party totalling $76,415.68. On December 19, 1990, a firm called ConsultMarine, acting as consultant for Saint John Marine with respect to the time charter party, placed AID on notice by telex of Afram's failure to pay amounts due under the Saint John Marine/Afram time charter, and of Saint John Marine's lien on subfreights. The telex, which was received by AID on December 19, 1990, stated in part:

> Unfortunately, Afram ha[s] failed to pay to Owners monies amounting to USD 76,-415.68. Owners are therefore obliged to exercise their rights of lien in respect of and over all and any freights or subfreights including any sums that may still be payable by you. You are therefore hereby requested and directed to refrain from making any payment of such monies, but, rather, to hold these to the account of

---

1. As the name implies, a time charter party provides that the charterer pays the owner based on the time period the vessel is used. Payment for use of a vessel under a time charter is called "hire." Under a voyage charter agreement, the charterer uses a vessel for one or more voyages. Payment under a voyage charter is called "freight." Payment under a subvoyage charter is called "subfreights."

the Owners. Should you ignore this notice and make payment I must advise that you will be at risk of having to make such payment twice.

AID responded by telex that same day:

A.I.D. has already *approved and processed for payment* to Afram International Inc. all freight vouchers or money owed them under this voyage.

(Emphasis added.) Since it appeared from this response that payment to Afram could still be stopped, ConsultMarine sent a further telex to AID on December 20, 1990:

[I]f funds have not yet actually been remitted then any payment arrangements should immediately be frozen as any payment effected after y[ou]r receipt of notice of lien would be in breach of that notice and you would be at risk of having to pay twice.

AID responded to ConsultMarine's December 20 telex by a telex of January 25, 1991:

As advised 19 Dec all freight due Afram Lines had been paid by A.I.D. as of that date.

AID's telex of January 25, 1991 was in error. All subfreights due Afram from AID had *not* been paid as of "19 Dec"; a second subfreights payment of $213,270 was paid by AID to Afram under the subvoyage charter party more than a week after AID had received the notice of lien. After receipt of ConsultMarine's telex, AID made no attempt to stop the payment of subfreights to Afram, and, on December 31, 1990, authorized the Treasury to pay to Afram the second subfreights installment of $213,270. Within two days of that authorization, the Treasury transferred the subfreights to Den norske Bank for further credit to Afram.

The $76,415.68 due Saint John Marine from Afram under the time charter party remained unpaid, and became the subject of this litigation. With the exception of the December 19, 1990 ConsultMarine telex, there is no evidence that, prior to December 31, 1990, AID was aware of the terms of the charter party between Saint John Marine and Afram. In its communications to AID, ConsultMarine represented that it acted on behalf of the vessel "owners," but at no time did ConsultMarine name Saint John Marine.

There was no provision in the Afram/AID subvoyage charter party with respect to the assignability of the subfreights payable by AID to Afram upon delivery of the government-owned cargo.

### B. *Litigation.*

On July 17, 1991, Saint John Marine commenced this action against the Government, seeking $76,415.68, plus interest from December 19, 1990.[2] The Government moved to dismiss on several procedural and jurisdictional grounds. In a memorandum opinion and order dated June 22, 1994, the district court denied the Government's motion, as follows.

First, the Government argued that the United States never consented to be sued on this claim because (1) Saint John Marine is seeking to "arrest" the Government's subfreight payments; (2) the subfreight payments for this purpose stand in the place of cargo; and (3) the SIAA provides in part that "no cargo owned or possessed by the United States ... shall ..., in view of the provision herein made for a libel in personam, be subject to arrest or seizure by judicial process in the United States or its possessions." 46 U.S.C.App. § 741. The district court held that the Saint John Marine claim is asserted *in personam* and may be presented against the United States under the provision of the SIAA that permits "any appropriate nonjury proceeding in personam" against the United States where such a suit could be asserted against the private owner or operator of a vessel or against the private owner or possessor of cargo. 46 U.S.C.App. § 742. The Government does not renew this argument on appeal. However, since this issue potentially affects jurisdiction, we address it below.

Second, the Government characterized this claim as in effect a garnishment that, as we held in *Chilean Line Inc. v. United States,* 344 F.2d 757, 762 (2d Cir.1965), cannot be asserted under the SIAA. The district court held that the lien asserted by Saint John

---

2. Nothing in the record evidences an attempt by Saint John Marine to recover from Afram.

Marine constitutes an assignment rather than a garnishment.

The district court rejected as well the Government's third argument, that the claim was barred by the discretionary function exception expressed in the language of the Federal Tort Claims Act (the "FTCA"), 28 U.S.C. §§ 1346(b), 2671–2680, and incorporated into the SIAA, *see In Re Joint Eastern & Southern Dists. Asbestos Litig.*, 891 F.2d 31, 35 (2d Cir.1989). The district court held that this exception applies solely to tort claims and does not insulate the Government's decision to disregard Saint John Marine's notice of lien. The Government has not raised this issue on appeal.

Fourth, the Government challenged the venue of the suit, relying on a provision of the SIAA that sets venue in the district in which any plaintiff resides or has its principal place of business in the United States, or in which the vessel or cargo *in rem* is found. 46 U.S.C.App. § 742. The district court, however, recognizing the unsettled character of the law on this issue, invoked "the interest of justice" to follow cases that permit suit by aliens in any district, citing *Malajalian v. United States*, 504 F.2d 842, 844 (1st Cir. 1974) (collecting cases) and *McGhee v. United States*, 154 F.2d 101, 104–05 (2d Cir.1946). The Government has not raised this issue on appeal.

Finally, the Government moved to dismiss on the ground that Afram is an indispensable party. The district court rejected this argument on the grounds that (1) complete relief can be afforded as between Saint John Marine and the Government, (2) the Government's concern about claims Afram might raise was speculative, and (3) the Government failed to show that Afram (a defendant with Saint John Marine in the same district on the Government's claim for damaged cargo aboard the M/V Saint John) could not be made a party to this action. The Government has not raised this issue on appeal.

Following the denial of the Government's motion to dismiss, and the filing of the answer, the parties agreed to a trial on submission, based on the stipulated facts set forth above. In an opinion dated July 26, 1995, the district court found in favor of Saint John Marine and ordered entry of judgment in the amount of $76,415.68 plus prejudgment interest from the date of suit. As the district court recited in its opinion, "[t]he Government does not dispute that Saint John Marine's position would be tenable in the context of a *private party's* failure to honor a lien on subfreights." The Government interposed two defenses at that stage of the litigation: first, that the claim is barred by the SIAA if the lien is (properly) characterized as a garnishment; and second, that the claim is barred by the Anti–Assignment Act if the lien is (improperly) characterized as an assignment of rights. In its opinion, the district court disposed of the garnishment claim by reference to its June 22, 1994 opinion in the case, which held that the lien here is "more closely aligned to an assignment of rights." The district court rejected the Government's argument under the Anti–Assignment Act on the ground that the courts in this Circuit "that have addressed this issue consistently have held that [the Anti–Assignment Act] does not apply to claims brought pursuant to the [SIAA]." In support of that holding, the district court cited *Todd Shipyards Corp. v. United States*, 1974 A.M.C. 1685, 1687 (S.D.N.Y.1974); *Seaboard Fruit Co. v. United States*, 73 F.Supp. 730 (S.D.N.Y.1946); *The West Grama*, 1924 A.M.C. 1444, 1445–46 (S.D.N.Y.1924); and *dicta* in *Ozanic v. United States*, 188 F.2d 228, 230–31 (2d Cir.1951). Judgment was entered on August 15, 1995.

## DISCUSSION

### A. *Jurisdiction.*

We have the duty to determine whether subject matter jurisdiction exists even if the issue is not presented by the parties. *United Food & Commercial Workers Union, Local 919 v. Centermark Properties Meriden Square, Inc.*, 30 F.3d 298, 301 (2d Cir.1994). The district court concluded that there is subject matter jurisdiction under 46 U.S.C.App. § 742, which waives immunity for certain suits *in personam*:

In cases where if [a] vessel were privately owned or operated, or if [ ] cargo were privately owned or possessed, or if a pri-

vate person or property were involved, a proceeding in admiralty could be maintained, any appropriate nonjury proceeding in personam may be brought against the United States....

Although we have recently said that "[i]n American admiralty law, 'the existence of a maritime lien is synonymous with the availability of a libel *in rem*,'" *Cornish Shipping Ltd. v. International Nederlanden Bank N.V.*, 53 F.3d 499, 503 (2d Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 183, 133 L.Ed.2d 121 (1995) (quoting Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* 622 (2d ed.1975)), we have also recognized that when subfreights are paid to the charterer after notice of the lien, "such payment does not discharge ... liability for the subfreights to the owner," *id.* at 502. When a shipowner gives timely notice to the party owing subfreights, the shipowner acquires "a cause of action ... that would not otherwise be available to it." *Id.* Since a shipowner could bring such an action *in personam* against a private subcharterer to enforce a lien against subfreights, the Government may similarly be sued pursuant to the SIAA.

B. *The SIAA and the Anti–Assignment Act.*

◼ In this appeal, the Government argues that the grant of power to sue in the SIAA does not affect the Anti–Assignment Act's limitation on the assignment of claims against the Government. This Court has not previously decided whether an assignment contrary to the Anti–Assignment Act defeats suits brought under the SIAA. An "assignment" is "(1) a transfer or assignment of any part of a claim against the United States Government or of an interest in the claim; or (2) the authorization to receive payment for any part of the claim." 31 U.S.C. § 3727(a). The statute provides in relevant part:

An assignment may be made only after a claim is allowed, the amount of the claim is decided, and a warrant for payment of the claim has been issued. The assignment shall specify the warrant, must be made freely, and must be attested to by 2 witnesses. The person making the assignment shall acknowledge it before an official who may acknowledge a deed, and the

official shall certify the assignment. The certificate shall state that the official completely explained the assignment when it was acknowledged. An assignment under this subsection is valid for any purpose.

31 U.S.C. § 3727(b).

Antecedents of § 3727 date as far back as 1846. Act of July 29, 1846, ch. 66, 9 Stat. 41. The Supreme Court, interpreting an 1853 version, Act of February 26, 1853, ch. 81, § 1, 10 Stat. 170, read the statute broadly, holding that it "embrace[s] every claim against the United States, however arising, of whatever nature it may be, and wherever and whenever presented." *United States v. Gillis*, 95 U.S. 407, 413, 24 L.Ed. 503 (1877). Saint John Marine, however, argues that the Anti–Assignment Act does not limit claims under the SIAA, because the SIAA (which was enacted in 1920) provided that "the provisions of all other Acts inconsistent herewith are hereby repealed." Act of March 9, 1920, ch. 95, § 13, 41 Stat. 525, 528. The district court agreed that the Anti–Assignment Act does not apply to suits under the SIAA, and relied for that proposition on several district court decisions issued in this Circuit over the last 70 years.

The doctrine on which the district court relied had its origin in *The West Grama*, 1924 A.M.C. 1444 (S.D.N.Y.1924), in which then-District Judge Augustus Hand concluded that the SIAA provision repealing earlier inconsistent laws foreclosed application of the Anti–Assignment Act to the SIAA:

The language of the [SIAA] is sufficiently sweeping ... to allow the courts of admiralty to enforce against the Government claims transferred by assignment which may be asserted against all other persons. I can see no reason why a broad statute enabling suits to be brought against the Government, *accompanied by a provision that all other acts inconsistent therewith are repealed,* should be limited by the terms of [the Anti–Assignment Act].

*Id.* at 1446 (emphasis added). In 1946, Judge Caffey issued a series of short opinions that relied principally on *The West Grama* and arrived at the same conclusion. *Seaboard Fruit Co. v. United States,* 73 F.Supp.

730 (S.D.N.Y.1946); *Seaboard Fruit Co. v. United States,* 73 F.Supp. 731 (S.D.N.Y. 1946); *Seaboard Fruit Co. v. United States,* 73 F.Supp. 732, 732–33 (S.D.N.Y.1946).[3]

Three years later, Judge Rifkind tested this hypothesis in *Ozanic v. United States,* 83 F.Supp. 4 (S.D.N.Y.1949), reviewing the *Seaboard Fruit* cases, *The West Grama,* and the authorities on which those cases had relied. *Id.* at 7. He observed that other courts had found that the Anti–Assignment Act may apply to suits under the Tucker Act, 28 U.S.C. § 1346(a)(2), and to the FTCA, *id.* §§ 1346(b), 2671–2680, notwithstanding the circumstance that the Tucker Act, like the SIAA, contains a repealer of inconsistent laws. *Ozanic,* 83 F.Supp. at 8. Judge Rifkind wrote:

> *The West Grama* relied upon the words of repeal. I confess my inability to discover any inconsistency between the grant of power to sue conferred by the [SIAA] and the [Anti–Assignment Act]. I see no necessary logical connection between the privilege to sue and the power to assign.

*Id.* The court went on to apply the Anti–Assignment Act to deny a petitioner's motion to intervene in a case brought under the SIAA. *Id.* at 9. On appeal, this Court declined the appellant's invitation to adopt the reasoning of *The West Grama* and the *Seaboard Fruit* cases: "We do not ... find it necessary to decide as to this reasoning and arguendo we shall assume that it is sound, because even so we think that [the petitioner] cannot prevail." *Ozanic v. United States,* 188 F.2d 228, 231 (2d Cir.1951).

By 1974, the district court in *Todd Shipyards Corp. v. United States,* 1974 A.M.C. 1685, 1687–88 (S.D.N.Y.1974), was invoking the "great weight of authority" represented by *The West Grama* and the *Seaboard Fruit* cases and could "conceive of no reason to abandon" the rule that the Anti–Assignment

Act does not apply to suits brought under the SIAA.

All of these cases ultimately rest on the assertion in *The West Grama* that the SIAA repealed all inconsistent statutes, including the Anti–Assignment Act. We agree with Judge Rifkind's reasoning in *Ozanic,* which undercuts all these cases: the right to sue under the SIAA has "no necessary logical connection" to the prohibition against assignments of claims under the Anti–Assignment Act. 83 F.Supp. at 8.

The rule against assignment of claims is consistent with the SIAA's waiver of sovereign immunity, because the Anti–Assignment Act merely determines when a claim against the Government is validly assigned. An assignment that does not comply with the Anti–Assignment Act cannot occur; the statute voids the assignment as against the United States. *In re Ideal Mercantile Corp.,* 244 F.2d 828, 830 (2d Cir.), *cert. denied,* 355 U.S. 856, 78 S.Ct. 84, 2 L.Ed.2d 63 (1957); *In re Freeman,* 489 F.2d 431, 432–33 (9th Cir. 1973). An invalid attempted assignment does not forfeit the claim; it leaves it as it was before the purported assignment. *Colonial Navigation Co. v. United States,* 149 Ct.Cl. 242, 181 F.Supp. 237, 240 (1960). On the other hand, the assignment remains enforceable as between the parties to the assignment. *Segal v. Rochelle,* 382 U.S. 375, 384, 86 S.Ct. 511, 517, 15 L.Ed.2d 428 (1966); *In re Ideal Mercantile Corp.,* 244 F.2d at 831–32; *Arthur Pew Constr. Co. v. Lipscomb,* 965 F.2d 1559, 1576 (11th Cir.1992).

In the event of an invalid assignment, the claim by the putative assignee against the Government fails because it is asserted by one who does not hold a valid claim. The defeat of such a claim is not a matter of sovereign immunity: one who asserts a claim that by law belongs to another is barred from

---

**3.** *Seaboard Fruit* cited a few other decisions from courts in this Circuit which are readily distinguishable. In *Smith v. United States Shipping Bd. Emergency Fleet Corp.,* 26 F.2d 337, 339 (2d Cir.), *cert. denied,* 278 U.S. 628, 49 S.Ct. 29, 73 L.Ed. 547 (1928), this Court held that the argument for invoking the Anti–Assignment Act was waived, and that, at any rate, the defendant, which claimed it was a Government agent, was "assimilat[ed] ... to the status of a private busi-

ness corporation." In *Rhodes v. United States,* 8 F.Supp. 124, 126 (E.D.N.Y.1934), the court rejected invocation of the Act, because "the claim assigned herein was originally against the United States Emergency Fleet Corporation, and assignments of claims against that corporation are not forbidden." Finally, *The Mandu,* 102 F.2d 459 (2d Cir.1939), does not involve a claim against the United States, and consequently does not reference either the SIAA or the Act.

recovery, regardless of whether the defendant is the Government or (in the words of the SIAA) "a private person or property [is] involved." In short, the SIAA waives sovereign immunity for the claim; but the Anti–Assignment Act determines who can assert it. The waiver of sovereign immunity does not create or confer a cause of action. *See Feres v. United States,* 340 U.S. 135, 140–41, 71 S.Ct. 153, 156–57, 95 L.Ed. 152 (1950); *Burkholder v. United States,* 56 F.Supp. 106, 108 (E.D.Pa.1944) ("[The SIAA] does not create new liabilities. It has to do entirely with remedies and . . . did not impose liabilities where none existed before. . . . ").[4] The SIAA waives sovereign immunity only to the extent of allowing suit against the United States as if it were a private party, but the repealer provision of the SIAA does not improve the underlying claim, allow it to be asserted by someone who cannot by law acquire it, or make a void claim into a valid one. Since the Anti–Assignment Act is not "inconsistent" with the SIAA, the repealer provision does not preclude application of the Anti–Assignment Act.

This conclusion is reinforced by analogy to the Tucker Act and the FTCA. The Supreme Court has had no trouble assuming that the Anti–Assignment Act applies to suits brought under the FTCA. *See United States v. Shannon,* 342 U.S. 288, 291–92, 72 S.Ct. 281, 283–84, 96 L.Ed. 321 (1952); *United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 370–73, 70 S.Ct. 207, 210–11, 94 L.Ed. 171 (1949). Similarly, the Supreme Court has applied the Anti–Assignment Act to claims that arise under the Tucker Act. *See United*

*States v. Dow,* 357 U.S. 17, 20–21, 78 S.Ct. 1039, 1043–44, 2 L.Ed.2d 1109 (1958).

As set forth more fully below, the Anti–Assignment Act is designed to prevent a traffic in government claims and to avoid the proliferation of claims and claimants. *See Aetna Casualty,* 338 U.S. at 373, 70 S.Ct. at 211. These purposes are served in the same way and to the same degree whether the assigned claims arise under maritime law or non-maritime law.

We hold that the SIAA did not repeal the Anti–Assignment Act in respect of maritime claims against the Government.

C. *The Maritime Lien as an Assignment of Claim against the United States.*

Saint John Marine argues that the assignment of the subfreights was made upon creation of the lien in the time charter party between Saint John Marine and Afram— *before* the subfreights became payable—and that the Anti–Assignment Act does not apply in this case because no claim against the United States thus existed until *after* the assignment. *See Hobbs v. McLean,* 117 U.S. 567, 575, 6 S.Ct. 870, 873–74, 29 L.Ed. 940 (1886) (Anti–Assignment Act did not apply because assignment of profits in partnership agreement predated the Government's award of a contract to the partnership). The Government argues that the assignment was not made until Afram defaulted in its payments to Saint John Marine under the time charter party—*after* the subfreights became payable—and that the Anti–Assignment Act applies because the claim against the United

---

4. This distinction is illustrated in *Hillier v. Southern Towing Co.,* 714 F.2d 714 (7th Cir.1983). A serviceman was killed by inhalation of ammonia fumes while monitoring the discharge of an ammonia cargo on board a barge. His widow sued the barge owner and the towing company, both private companies, and they in turn impleaded the United States under the SIAA, seeking indemnity on the ground that Hillier's death was primarily or entirely attributable to the Coast Guard's negligence in failing to provide proper training and equipment. The Seventh Circuit assumed without deciding that there was a colorable claim in admiralty "premised on the idea that the United States was the active wrongdoer," and that there was *in personam* jurisdiction over the United States; but the court relied on *Feres* to decide that the United States had

breached no legal duty to Hillier. 714 F.2d at 721. "For the United States to be the active wrongdoer, however, it must first be a wrongdoer." *Id.* The Seventh Circuit observed that the waiver of sovereign immunity under the FTCA is " 'not the creation of new causes of action but acceptance of liability under circumstances that would bring private liability into existence. . . . We know of no American law which ever has permitted a soldier to recover for negligence, against either his superior officers or the government he is serving.' " *Id.* (citing *Feres,* 340 U.S. at 141, 71 S.Ct. at 157). Similarly, military personnel on active duty cannot sue the Government under the SIAA: "The [SIAA] is no more a source of rights as distinct from a waiver of the government's defense of sovereign immunity than the [FTCA]." *Id.*

States thus did exist at the time of the assignment. We agree with the Government on this issue.

■ A lien on subfreights operates as follows:

> If the charterer defaults on its payment of freight or its other obligations under the charter party, the shipowner may exercise its lien on the subfreights by giving notice to the consignee. Before such notice is given, however, the lien is essentially inchoate. Indeed, the lien is altogether extinguished if the consignee pays the subfreights to the charterer or its agent in good faith prior to receiving notice of the lien.

*Cornish Shipping Ltd. v. International Nederlanden Bank N.V.*, 53 F.3d 499, 502 (2d Cir.), *cert. denied*, —— U.S. ——, 116 S.Ct. 183, 133 L.Ed.2d 121 (1995).

The "claim against the United States" at issue here is Afram's right to collect subfreights from AID pursuant to the subvoyage charter party. Pursuant to clause 15 of the subvoyage charter party, the Government's obligation to pay this claim arose when the vessel arrived with its cargo at its first port. We therefore reject Saint John Marine's argument that the charter party that provided for a lien was a "transfer" of Afram's right to receive subfreights.

■ "It is a settled principle of statutory construction that, absent contrary indications, Congress intends to adopt the common law definition of statutory terms." *RTC v. Diamond*, 45 F.3d 665, 672 (2d Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 2609, 132 L.Ed.2d 853 (1995) (internal quotation marks and citation omitted). The meaning of the term "assignment" in contract law is not altered in the maritime context; "a charter party is subject to all the rules and requirements of contract law." 2 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 11–1, at 171 (2d ed.1994) (citing *Great Circle Lines, Ltd. v. Matheson & Co.*, 681 F.2d 121 (2d Cir.1982)).

■ We therefore apply familiar principles of contract law. "An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which the assignor's right to performance by the obligor is extinguished in whole or in part and the assignee acquires a right to such performance." Restatement (Second) of Contracts § 317(1) (1979). Clause 18 of the time charter party provides for the transfer to Saint John Marine of Afram's right to receive subfreights, upon certain conditions. An assignment can be conditional. *Id.* § 331. However, "a purported assignment of a right expected to arise under a contract not in existence operates only as a promise to assign the right when it arises and as a power to enforce it." *Id.* § 321(2). "[T]here cannot be an effective assignment of a right not yet in existence. . . . " *Id.* § 331 cmt. b. The provision in the charter party that creates the lien on subfreights was therefore at most a conditional assignment, or promise, of a right to receive subfreights if and when (1) Afram entered into a subvoyage charter party, and (2) the subfreights became due and collectible, and (3) sums became due under the charter party. In short, the lien on subfreights did not effect an assignment at the time that it was created.

The stipulation of facts does not say whether the subfreights became due and collectible before, or after, sums became due on the charter party. In any event, and regardless of whether the assignment was incomplete until Saint John Marine gave its notice to the Government, we think it is clear that the lien effected the assignment of an existing claim against the Government. Therefore, the lien on subfreights in this case is an assignment within the meaning of the Anti–Assignment Act. *See Hornbeck Offshore Operators, Inc. v. Ocean Line of Bermuda, Inc.*, 849 F.Supp. 434, 442–43 (E.D.Va.1994) (observing on similar facts that Anti–Assignment Act would apply because "it is well established that a maritime lien on subfreights is a derivative right which amounts to essentially an agreed assignment of the rights of the charterer in the unpaid freights").

### D. *Assignment by Operation of Law.*

■ Although we conclude that the SIAA does not repeal the Anti–Assignment Act in respect of maritime claims against the Gov-

ernment, and that a maritime lien on subfreights is an assignment within the meaning of the Anti–Assignment Act, we hold nevertheless that the Anti–Assignment Act does not bar Saint John Marine's claim, because the lien on subfreights is an assignment that is effected by operation of law and does not implicate the dominant policy objectives of the Anti–Assignment Act. As the Supreme Court has explained, the Anti–Assignment Act is intended to prevent a traffic in government claims, which would breed corruption and influence-peddling, and to avoid the proliferation of claims and claimants, which would increase the Government's risks and burdens in the handling and payment of claims:

> Its primary purpose was undoubtedly to prevent persons of influence from buying up claims against the United States, which might then be improperly urged upon officers of the Government.... [Another] purpose was to prevent possible multiple payment of claims, to make unnecessary the investigation of alleged assignments, and to enable the Government to deal only with the original claimant.

*United States v. Aetna Casualty & Surety Co.,* 338 U.S. 366, 373, 70 S.Ct. 207, 211, 94 L.Ed. 171 (1949) (citations omitted). The Court has noted that "[o]ther courts have found yet another purpose of the statute, namely, to save to the United States 'defenses which it has to claims by an assignor by way of set-off, counter claim, etc., which might not be applicable to an assignee.'" *United States v. Shannon,* 342 U.S. 288, 291–92, 72 S.Ct. 281, 284, 96 L.Ed. 321 (1952) (citation omitted).

At one time, the Court construed the Anti–Assignment Act strictly, but "[t]he rigor of this rule was very early relaxed in cases which were thought not to be productive of the evils which the statute was designed to obviate." *Aetna Casualty,* 338 U.S. at 373, 70 S.Ct. at 212. The Anti–Assignment Act now generally prohibits the "voluntary assignment of demands against the govern-ment," *Erwin v. United States,* 97 U.S. 392, 397, 24 L.Ed. 1065 (1878); *see also Shannon,* 342 U.S. at 292, 72 S.Ct. at 284; *Aetna Casualty,* 338 U.S. at 374–75, 70 S.Ct. at 212–13, but does not prohibit assignments or transfers of claims against the United States that occur involuntarily by operation of law, *Erwin,* 97 U.S. at 397; *United States v. Gillis,* 95 U.S. 407, 416, 24 L.Ed. 503 (1877).[5] This is true without regard to whether an assignment by operation of law produces some of the inconveniences sought to be avoided by the Anti–Assignment Act. *Aetna Casualty,* 338 U.S. at 375–76, 70 S.Ct. at 212–213 (rejecting Government's theory that "an assignment by operation of law is not always exempt from the bar of [the Anti–Assignment Act], but that in addition the assignment must be of a kind that will not involve the Government in the procedural difficulties previously referred to"). Moreover, "[t]hat an assignment is voluntary is not an end to the matter." *Shannon,* 342 U.S. at 292, 72 S.Ct. at 284. The Supreme Court has held that some transfers are valid under the Anti–Assignment Act even though they are intentional and volitional, because they are so closely analogous in effect and design to transfers that occur by operation of law. Thus, a testamentary transfer of a claim, which is voluntary, may burden the Government by multiplying the number of claimants, but no lesser burden is caused when the transfer is by intestacy, *Aetna Casualty,* 338 U.S. at 375 n. 12, 70 S.Ct. at 212 n. 12, and "[i]t would be unwise to make a distinction" between these two transfers solely for purposes of the Anti–Assignment Act, *Shannon,* 342 U.S. at 292, 72 S.Ct. at 284. For the same reason, the Court declined to draw a distinction under the Anti-Assignment Act between a voluntary assignment "of all [the debtor's] effects" for the benefit of creditors and an assignment by law made in bankruptcy:

> The language of the statute, "all transfers and assignments of any claim upon the United States, or of any part thereof, or

5. Other exceptions under the Anti–Assignment Act include transfers by will or intestacy, transfers incident to proceedings in bankruptcy or receivership, transfers by succession of one business entity for another, and assignments by judicial sale or order. *See Keydata Corp. v. United States,* 205 Ct.Cl. 467, 504 F.2d 1115, 1118 (1974); *New York Guardian Mortgagee Corp. v. Cleland,* 473 F.Supp. 422, 433–34 (S.D.N.Y. 1979).

any interest therein," is broad enough (if such were the purpose of Congress) to include transfers by operation of law, or by will. Yet we held it did not include a transfer by operation of law, or in bankruptcy, and we said it did not include one by will. The obvious reason of this is that there can be no purpose in such cases to harass the government by multiplying the number of persons with whom it has to deal, nor any danger of enlisting improper influences in advocacy of the claim, and that the exigencies of the party who held it justified and required the transfer that was made.

*Goodman v. Niblack,* 102 U.S. 556, 560, 26 L.Ed. 229 (1880); *see also Aetna Casualty,* 338 U.S. at 376, 70 S.Ct. at 213 (citing *Goodman* with approval).

 We conclude that the lien at issue effects an assignment "by operation of law" as that term has been construed by the Supreme Court. Although the lien arises from a contract voluntarily entered into by the shipowner and the charterer, the operation and enforcement of the lien is determined by a well-recognized body of admiralty law. *See* 1 Thomas J. Schoenbaum, *Admiralty and Maritime Law* § 9–1 (2d ed.1994); *Cornish Shipping Ltd. v. International Nederlanden Bank N.V.,* 53 F.3d 499, 502 (2d Cir.), *cert. denied,* —— U.S. ——, 116 S.Ct. 183, 133 L.Ed.2d 121 (1995) ("Most aspects of the law governing a shipowner's maritime lien on subfreights are well established.") If a contractual maritime lien is not, strictly speaking, a transfer by operation of law, it is analogous to maritime liens that are non-contractual. *See* 1 Schoenbaum, *supra,* § 9–1, at 482 ("Most maritime liens arise by operation of the general maritime law, but some are created by statute.... "). Thus, Saint John Marine's lien on subfreights is a transfer by operation of law either in fact or by analogy. Moreover, we think that this lien does not subvert the purposes of the Anti–Assignment Act, or at least that it does not differ from statutory liens in its impact on the Anti–Assignment Act's purposes.

Two decisions of the Supreme Court illustrate these principles and support our conclusion. In *United States v. Aetna Casualty &* *Surety Co.,* 338 U.S. 366, 70 S.Ct. 207, 94 L.Ed. 171 (1949), the Court considered three separate cases; in each case an insurance company had paid a claim for an injury caused by the negligence of a federal employee and thereafter brought suit against the Government under the FTCA to recover on the underlying tort. In the first case, the cause of action was assigned to the insurer by operation of New York's workmen's compensation law; in the second, the insurer asserted a right of subrogation under the terms of the insurance contract; in the third, two insurance companies had paid portions of a claim and brought suit in their own names to recover those amounts. *Id.* at 368–69, 70 S.Ct. at 209. In each case, the Court held that the subrogation of the insurer to the claim against the Government was unaffected by the Anti–Assignment Act. *Id.* at 376–81, 70 S.Ct. at 213–16. When Congress waived sovereign immunity for tort claims under the FTCA, according to the Court, Congress did not intend to exclude claims arising by subrogation, *id.* at 380, 70 S.Ct. at 215, and understood that subrogation claims would not be barred by the Anti–Assignment Act because they were transferred by operation of law, *id.* at 377–78, 70 S.Ct. at 213–14. The Court did not distinguish between statutory subrogation and the contractual kind.

Two years later, in *United States v. Shannon,* 342 U.S. 288, 72 S.Ct. 281, 96 L.Ed. 321 (1952), the Supreme Court applied the Anti–Assignment Act to defeat a claim transferred by contract. The Boshamer family had leased a parcel of property to the United States. In 1945, soldiers damaged buildings located on the Boshamers' adjoining property. In 1946, the Boshamers sold both the leased and unleased property to the Shannons, with the specific provision that " 'the sellers hereby release to the purchasers any claim, reparation, or other cause of action against the United States Government for any damage caused the property.' " *Id.* at 290, 72 S.Ct. at 283. The Court declared that the assignment "falls clearly within the ban of the Anti–Assignment Act":

There can be no doubt that in the present case the assignment was voluntary.... The voluntary nature of the assignment is

reflected in the fact that one of the respondents testified on cross-examination that he understood that he was "buying a claim against the Government."

*Id.* at 291–92, 72 S.Ct. at 283–84. The Court recognized that not all voluntary assignments are prohibited by the Anti–Assignment Act, but emphasized that the exceptions were closely analogous to certain transfers that occurred by operation of law. The Court found "no such compelling analogies" in *Shannon.* *Id.* at 292, 72 S.Ct. at 284. "On the contrary, [*Shannon* ] presents a situation productive of the very evils which Congress intended to prevent." *Id.* at 292–93, 72 S.Ct. at 284.

The transfer of the damage claim in *Shannon,* which was held *not* to have arisen by operation of law, was ancillary to the real estate transaction, was capable of being effected separately, and was irregular in the sense that real estate (which is customarily sold with the improvements and deeded rights) is not ordinarily marketed with claims for property damage. By contrast, the insurance subrogation arrangements in *Aetna Casualty,* which were held to have arisen by operation of law, were integral and customary aspects of an ordinary commercial transaction. Here, although the lien on subfreights was created by contract, the Government itself recognizes that the mechanism by which this lien is enforced is "rooted in traditional maritime law." Appellant's Brief at 24. The resulting transfer of the claim was integral to the time charter party, which served an independent and customary commercial purpose in a settled and customary commercial relationship.

The lien on subfreights operates in a way that does not expose the Government to the evils addressed by the Anti–Assignment Act. The risks of competing claims and double payment are minimal. True, the payment of subfreights to a charterer after notice of a lien "does not discharge ... liability for the subfreights to the owner." *Cornish Shipping,* 53 F.3d at 502. But the Government is protected by the notice requirement: "Before ... notice is given, ... the lien is essentially inchoate.... [T]he lien is altogether extinguished if the [subcharterer] pays the subfreights to the charterer or its agent in good faith prior to receiving notice of the lien." *Id.* Like an insurer's contractual subrogation claim, a lien on subfreights is not a "voluntary assignment of demands against the government." *Erwin v. United States,* 97 U.S. 392, 397, 24 L.Ed. 1065 (1878). It is contractual—like most insurance subrogation claims—but it is driven by the underlying transactional purposes rather than by the will to acquire (or cede) a claim against the Government, something that presumably neither Afram nor Saint John Marine would wish to happen. Moreover, the lien serves solely to secure Afram's obligations under the time charter party, and is created by language that applies without regard to whether the subcharterer is a Government agency or a private party.[6] Such a general assignment does not pose the dangers of corruption, influence-peddling, or the multiplication of claims or payments. *See Aetna Casualty,* 338 U.S. at 373, 70 S.Ct. at 211. As to the preservation of the Government's defenses or counterclaims, *see Shannon,* 342 U.S. at 291–92, 72 S.Ct. at 283–84, the Government has not argued that the lien of subfreights differs in that respect from maritime liens that arise under statutory or general maritime law. *See* 1 Schoenbaum, *supra,* § 9–1, at 482. Nor is this an instance where an assignee "understood that [it] was 'buying a claim against the Government.' " *Shannon,* 342 U.S. at 292, 72 S.Ct. at 284.

## CONCLUSION

We hold that the Anti–Assignment Act may apply to suits that arise under the

---

**6.** The Government "suggest[s] that shipowners likely view the Government ... as having 'deep pockets,' and that therefore, when the carriage of Government cargo is anticipated, the owners may fail diligently to examine the finances of the companies to whom they charter their vessel." Reply Brief at 17. Apart from being wholly speculative and not supported by the record, this argument is so general that it would apply to all assignments of government claims, whether or not they comply with the Anti–Assignment Act. Moreover, the purposes of the Anti–Assignment Act, as described by the Supreme Court, *see Aetna Casualty,* 338 U.S. at 373, 70 S.Ct. at 211; *Shannon,* 342 U.S. at 291–92, 72 S.Ct. at 284, are not implicated by this contention.

SIAA. We also hold that a maritime lien on subfreights payable by a government agency is an assignment of a claim against the United States within the meaning of the Anti–Assignment Act. However, we rule that such a lien is not barred by the Anti–Assignment Act, because it assigns a claim against the Government by operation of law. Since the Government concedes that, if it were a private party, it would be liable pursuant to the SIAA, we affirm the judgment of the district court.